UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **CYNTHIA L. HAYS** | * | **CIVIL ACTION NO. 07-0556** |
| **VERSUS** | * | **JUDGE JAMES** |
| **MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAGISTRATE JUDGE HAYES** |

**REPORT AND RECOMMENDATION**

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

**Background & Procedural History**

Cynthia L. Hays filed the instant application for Disability Insurance Benefits on August 8, 2003. (Tr. 61-63). She alleged disability since October 31, 2002, due to fibromyalgia, chronic myofascial pain syndrome, vertigo, and sensitivity to salicylates. (Tr. 61, 68). The claim was denied at the initial stage of the administrative process. (Tr. 39, 51-54). Thereafter, Hays requested and received a May 6, 2005, hearing before an Administrative Law Judge ("ALJ"). (Tr. 508-518).[1] In an August 2, 2006, written decision, the ALJ determined that Hays was not disabled under the Social Security Act, finding at Step Four of the sequential evaluation process

---

[1] The ALJ held a supplemental hearing on February 6, 2006. (Tr. 496-507).

that she was able to return to past relevant work as a hair stylist. (Tr. 12-24).[2] Hays appealed the adverse decision to the Appeals Council. On January 23, 2007, the Appeals Council denied Hays's request for review; thus the ALJ's decision became the final decision of the Commissioner. (Tr. 6-8).

On March 22, 2007, Hays sought review before this court. She alleges the following errors:

    (1)    the ALJ failed to comply with the Commissioner's policies in evaluating the severity of plaintiff's fibromyalgia;

    (2)    the ALJ failed to consider the various factors set forth in 20 C.F.R. § 404.1527(d) in evaluating the opinions from plaintiff's treating sources; and

    (3)    the ALJ erred when he did not recontact plaintiff's medical providers as required by 20 C.F.R. § 404.1512(e).

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying the improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. While substantial evidence lies somewhere between a scintilla and a

---

[2] Hays was insured for disability benefits through March 31, 2004. (Tr. 16). Thus, she had to establish disability on or before that date. *Id*.

preponderance, substantial evidence clearly requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). Conversely, a finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Secretary. *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

  (1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

  (2) An individual who does not have a "severe impairment" of the requisite duration will not be found to be disabled.

  (3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

  (4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

  (5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See, Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## **Analysis**

  The ALJ found at Step Two of the sequential evaluation process that Hays suffers from severe impairments of "disc disease cervical spine, fibromyalgia, Lyme disease, somatoform disorder, major depressive disorder and cognitive disorder." (Tr. 18, 23). The ALJ concluded, however, that these impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at Step Three of the process.

(Tr. 18-19, 23).

The ALJ next determined that Hays retains the residual functional capacity to perform medium work reduced by slight limitations in understanding, remembering and carrying out simple instructions; moderate limitations in understanding, remembering and carrying out detailed instructions; slight limitations in making adjustments on simple work-related decisions; moderate limitations in responding appropriately to work pressures in a usual work setting; and slight limitations in responding appropriately to changes in a routine work setting. (Tr. 22-23).[3]

In contrast to the ALJ's residual functional capacity assessment, plaintiff's treating

---

[3] Medium work is defined and explained by Social Security Ruling 83-10:
>[t]he regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.
>
>The considerable lifting required for the full range of medium work usually requires frequent bending-stooping. (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist). Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward). However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semi-skilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

Social Security Ruling 83-10.

5

physicians, Peter Milder, M.D. and Jonathan Forrester, M.D., both found that her impairments effectively incapacitated her from any type of work. On the other hand, the consultative physical examiner, David Hebert, M.D., found that plaintiff's impairments imposed no physical limitations whatsoever. Plaintiff's three assignments of error essentially challenge the ALJ's decision to credit the findings of the consultative physicians in lieu of the functional limitations recognized by plaintiff's treating physicians.

The record reflects that Dr. Milder treated plaintiff from May 9, 2003, through at least January 20, 2006. (Tr. 305, 494). Dr. Milder's notes from plaintiff's initial visit indicate that fibromyalgia was positive for numerous fibro points, neck spasm, and occipital tenderness. (Tr. 305). Milder assessed chronic neck pain, fibromyalgia, irritable bowel syndrome, and restless leg syndrome. *Id*.

On September 23, 2003, Milder completed a Fibromyalgia and Myofascial Pain Syndrome Functional Questionnaire. (Tr. 298-303). He indicated that plaintiff met the American Rheumatological clinical testing criteria for fibromyalgia, and that her prognosis was poor. *Id*. Milder further indicated that Hays exhibited 16/18 fibro points, and identified numerous symptoms. *Id*. He stated that she had poor concentration, and that her pain was constant and severe. *Id*. Milder opined that Hays was not a malingerer. *Id*. He indicated that her pain was severe enough to constantly interfere with attention and concentration. *Id*. She was also severely limited in her ability to handle work stress. *Id*. Hays could walk about ½ block without rest or severe pain. *Id*. She could sit, stand, and walk for less than two hours continuously. *Id*. Milder opined that she could not work for an eight hour day. *Id*. She needed a job that permitted her to shift at will from sitting to standing, etc. *Id*. She also needed to sometimes lie down at unpredictable intervals during a work shift. *Id*. She could not tolerate

prolonged sitting, nor lift ten pounds or more. *Id*. She also suffered significant limitations in reaching, handling, or fingering. *Id*. Hays would need to miss work more than three times per month. *Id*.

Dr. Milder's 2003 assessment is supported by subsequent letters. For instance, in a May 2, 2005, letter, Dr. Milder wrote that Hays suffered from fibromyalgia with 16/16 positive trigger points. *Id*. More recent testing raised the possibility of Lyme disease. *Id*. Resultant symptoms included chronic pain, fatigue, and difficulties with concentration and confusion, i.e. fibro fog. *Id*. She also experienced increased difficulties with insomnia. *Id*. Her problems made it difficult to attend to activities of daily living and impeded her ability to function on a reliable basis in any type of employment setting. *Id*. Milder opined that Hays could not maintain any position, be it sitting or standing, for more than 30 minutes at a time. *Id*. Prognosis for improvement was poor. *Id*.

In a June 6, 2005, letter to plaintiff's counsel, Dr. Milder wrote that there was no doubt that plaintiff's symptoms from Lyme disease and fibromyalgia continued. (Tr. 444). He stated that it would be impossible and against his advice for Hays to even attempt to meet the demands of full time work, no matter the type or exertional level involved. *Id*.

On June 16, 2005, Jonathan Forester, M.D. wrote a To Whom it May it Concern letter stating that Hays had been diagnosed with severe fibromyalgia complicated by chronic Lyme disease. (Tr. 426). She complained of extreme pain and fatigue, and stayed in bed most days. *Id*. She had a Western Blot lab test which was highly specific for Lyme. *Id*. She had not responded to three antibiotics. *Id*. He believed that Hays was "unable to be viable in any gainful

job or occupation." *Id.*[4]

Obviously, the limitations recognized by plaintiff's treating physicians are inconsistent with the ALJ's residual functional capacity assessment, and if credited in their entirety, would undermine the ALJ's Step Four determination. Accordingly, the ALJ endeavored to discount Dr. Milder and Dr. Forester's assessments. In this context, the Fifth Circuit has held that

> "ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985). The treating physician's opinions, however, are far from conclusive. "[T]he ALJ has the sole responsibility for determining the claimant's disability status." *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990).
>
> Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony. The good cause exceptions we have recognized include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. *Scott*, 770 F.2d at 485. In sum, the ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." Id.; see also 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have.").

*Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).

The instant ALJ discounted Dr. Milder and Forester's assessments because their findings were based upon plaintiff's symptoms and not objective medical evidence. (Tr. 21). The

---

[4] While a doctor's statement that a claimant is "disabled" or "unable to work" is afforded no special significance under the regulations, the statements remain probative to the extent that they recognize specific limitations. *Contrast*, 20 C.F.R. § 404.1527(e)(1); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003)

difficulty with the ALJ's rationale, however, is that there are no objective tests to conclusively confirm fibromyalgia. *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (citations omitted). Rather,

> [f]ibromyalgia is a disorder defined by the American College of Rheumatology (ACR) and we recognize it as medically determinable if there are signs that are clinically established by the medical record. The signs are primarily the tender points. The ACR defines the disorder in patients as "widespread pain in all four quadrants of the body for a minimum duration of 3 months and at least 11 of the 18 specified tender points which cluster around the neck and shoulder, chest, hip, knee, and elbow regions." Other typical symptoms, some of which can be signs if they have been clinically documented over time, are irritable bowel syndrome, chronic headaches, temporomandibular joint dysfunction, sleep disorder, severe fatigue, and cognitive dysfunction.

May 11, 1998, SSA Memorandum; *In Re: Fibromyalgia, Chronic Fatigue Syndrome Objective Medical Evidence Requirements for Disability Adjudication*.

In the instant case, Dr. Milder never documented less than the requisite number of fibromyalgia trigger points. (*See e.g.*, Tr. 298-303, 348, 353-354, 358, 425, 494).[5] Hays also exhibited virtually all of the symptoms related to fibromyalgia including, irritable bowel syndrome, chronic headaches, sleep disorder, severe fatigue, and cognitive dysfunction. (Tr. 244-245, 305, 348, 358, 453, 96, 425, 427-431).

The ALJ further observed that it was possible that the treating physicians' assessments were motivated by a desire to assist a sympathetic patient. (Tr. 21). Of course, that could be said in every case. The ALJ then stated that such motives were more likely in situations where the opinions substantially departed from the other evidence of record. (Tr. 21). He proceeded to discuss and credit the examination findings of two consultative physicians, E. C. Simonton, M.D. and David Hebert, M.D.

---

[5] Albeit, he sometimes misstated the total number of possible trigger points. (*See e.g.*, Tr. 425, 494).

On October 7, 2003, Dr. Simonton, an orthopedist, examined Hays at the request of Disability Determination Services. (Tr. 310-311). Simonton noted that Hays's most recent diagnosis was fibromyalgia and myofascial pain syndrome. *Id*. She exhibited a full range of motion in the shoulders, elbows, wrists, and fingers. *Id*. Her sensation was normal in upper and lower extremities. *Id*. Straight leg raising was painless to 90 degrees bilaterally. *Id*. Her gait and stance were normal. *Id*.[6]

On July 12, 2005, Dr. Hebert examined Hays at the request of Disability Determination Services. (Tr. 436-439). He noted that her blood tests were extremely positive for Lyme Disease. *Id*. Her gait and station were completely normal. *Id*. She demonstrated perhaps two trigger points, but otherwise no real evidence of trigger points "today." *Id*.[7] No evidence of myositis or inflammation of muscles or joints on today's evaluation. *Id*. Motor strength in all areas was 5/5 and hand grip was 5/5. *Id*. Hand grasping and dexterity were excellent. *Id*. She was alert and oriented in all areas. *Id*. He diagnosed generalized fibromyalgia which was well treated at the time. *Id*. He further assessed a history of Lyme disease which was essentially in remission. *Id*.[8] Hebert did not find any inflammation of any joints or limitation of motion in any joints. *Id*. Despite her diagnoses, Dr. Hebert saw no reason why Hays could not perform routine walking,

---

[6] Simonton seemed to doubt that fibromyalgia could cause work-related limitations in any individual: "I have seen a number of people diagnosed with fibromyalgia, but few, if any, suffer from work." *Id*.

[7] Hebert's apparent qualification that Hays did not exhibit the requisite trigger points on the day of the examination is consistent with other record evidence showing that her condition waxed and waned.

[8] Hebert also diagnosed history of reactive depression, adequately treated with psychotropic drugs. *Id*.

sitting, standing, carrying and lifting for an eight hour day. *Id.*[9]

The undersigned emphasizes that all of the physicians and the Commissioner agree that plaintiff suffers from fibromyalgia. Therefore, the only dispute centers upon the degree of functional limitation imposed by plaintiff's recognized impairment(s). Dr. Simonton is an orthopedist and his report focused upon plaintiff's range of motion. Likewise, Dr. Hebert's report reflected that he was unduly influenced by plaintiff's full range of motion and lack of joint inflammation.[10] Courts, however, have recognized that

> [i]n stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. Hence, the absence of swelling joints or other orthopedic and neurologic deficits is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced. Rather, these negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue.

*Green-Younger*, 335 F.2d at 108-109 (citations and internal quotation marks omitted). Moreover, medical opinions that are premised upon the lack of objective findings are not particularly relevant when assessing the effects of fibromyalgia. *See, Rogers v. Commissioner of Social Security*, 486 F.3d 234, 245 (6th Cir. 2007). Thus, Simonton and Hebert's examination findings do not provide a reliable foundation for undermining the limitations recognized by plaintiff's treating physicians.

Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable

---

[9] Hebert also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (Tr. 440-443). He indicated that plaintiff had no limitations at all. *Id*.

[10] Hebert specializes in internal medicine. (Tr. 435).

clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "'[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted). However, an ALJ cannot reject a medical opinion without an explanation supported by good cause. *See, Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted). Here, the ALJ has not provided good cause for rejecting the limitations recognized by plaintiff's treating physicians.[11] The continued vitality of the treating physicians' assessments materially undermines the ALJ's residual functional capacity determination.[12]

Because the foundation for the ALJ's Step Four determination was premised upon a residual functional capacity which is not supported by substantial evidence, the undersigned finds that the ALJ's ultimate conclusion that plaintiff was not disabled is likewise not supported by substantial evidence. Accordingly,

---

[11] The ALJ also determined that plaintiff suffered from various mental impairments with resulting limitations. The ALJ's assessment of plaintiff's mental residual functional capacity is facially supported by a mental evaluation administered by David J. Williams, Ph.D. (*See*, Tr. 427-433).
At one point in his decision, the ALJ observed that Dr. Williams indicated that plaintiff demonstrated symptom magnification because she said that her pain rose to 45 on a 10 point scale. (Tr. 21, 430). In brief, the Commissioner emphasizes that plaintiff's exaggerated pain symptoms do not "match clinical findings showing little to no limitations." (Gov.'t Memo., pg. 6). Presumably, the Commissioner is referring to the findings of the consultative physicians. However, the consultative examinations focused upon irrelevant considerations. *See*, discussion, *supra*. Moreover, in all probability, plaintiff exaggerated her pain simply to emphasize the severity of her condition.

[12] This does not mean that upon remand the ALJ is obliged to credit the limitations recognized by plaintiff's treating physicians. Further development may provide valid grounds for discounting the opinions. For instance, a rheumatology specialist may be able to examine plaintiff, review her extensive treatment records, and then provide a well-reasoned assessment of the limitations imposed by her impairment(s).

IT IS RECOMMENDED that the matter be REVERSED and REMANDED for further proceedings consistent herein.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 12th day of June, 2008.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE